**FILED**

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

MAR 02 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | ) Case No. |
| Google, Inc. accounts | ) |
| | ) **2:16 - SW - 0 1 2 4    EFB** |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

**SEALED**

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324a(a)(1)(A), (B) | Unlawful employment of aliens |
| 29 U.S.C. §§ 206(a)(1)(C), (f)(1) | Wage Theft / Fair Labor Standards Act violations |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

MARC BEESON, SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-2-2016

_____
*Judge's signature*

City and state:   Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Marc Beeson, a Special Agent (SA) with the Department of Homeland Security (DHS),

Homeland Security Investigations (HSI), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I am a Special Agent with the Department of Homeland Security (DHS), U.S.

Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI),

currently assigned to the Office of the Resident Agent-in-Charge, Stockton (herein HSI

Stockton) Office.  I have been employed by ICE (and by the Legacy Immigration and

Naturalization Service (INS)) since January 2002.  I am an "investigative or law enforcement

officer of the United States" within the meaning of 18 U.S.C. §2510(7).  As such, I am

empowered to conduct investigations of, and to make arrests for offenses enumerated in 18

U.S.C. § 2516.  I have also been cross-designated by the Drug Enforcement Administration

(DEA) and am empowered to investigate and make arrests for offenses under Title 21 of the

United States Code.  Prior to my employment with ICE, I was an Immigration Inspector with

INS at the San Francisco International Airport for ten years.

2.      Before I became a Special Agent I attended the Immigration Officers Basic

Training Course, in Glynco, GA, in 1992 and completed a two week Customs Cross Designated

Training Course in 2004, after Legacy INS and Legacy Customs merged to form ICE.  I am

familiar with criminal investigations related to drug trafficking activity, money laundering, child

pornography and exploitation, human trafficking, and other types of crimes.  While conducting

these types of investigations, I have written reports of investigation; interviewed hundreds of

1

suspects; written, served and participated in the execution of dozens of search/arrest and seizure warrants; conducted physical surveillance; arrested hundreds of violators, and obtained and analyzed telephone tolls, pen register data, public source records, official immigration documents, financial records, notes, ledgers, and pay/owe sheets ("trick books" and "tally sheets").

3.     Over the course of my career, I have participated in and/or planned over 100 operations that included physical and electronic surveillance. I have also interviewed confidential sources (CS), confidential witnesses (CW), and defendants regarding a wide array of criminal activities. I have testified in Grand Jury proceedings. I have arrested dozens of people, have written reports, analyzed records and documents in conjunction with the preparation of affidavits requesting authorization for the execution of search and arrest warrants and I have authored, planned and executed dozens of said warrants. I have gained knowledge in the use of various investigative techniques, including the utilization of physical surveillance, undercover agents, confidential sources, confidential witnesses, controlled purchases of illegal narcotics, electronic surveillance, consensual monitored recordings, investigative interviews, trash and mail covers, financial investigations, the service of grand jury subpoenas, and the execution of federal search and arrest warrants.

4.     The conclusions and opinions set forth below are based on my experience and training as a Special Agent, my direct participation in this investigation as described below, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation. Since this affidavit is being submitted for the limited purpose of showing probable cause to secure search and arrest warrants, I have not included each

2

and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of the above listed violations are located in the TARGET ACCOUNT detailed herein. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part.

5.      As a result of my participation in this investigation and through review and analysis of information received from various sources, including reports and discussions with law enforcement investigators, administrative subpoenas, trash runs, and surveillance, I am familiar with this investigation.

6.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the following "TARGET ACCOUNT":

        a.      Google Account: sharmistha.barai@gmail.com.

7.      These TARGET ACCOUNT is specifically described in Attachment A-1, and this affidavit seeks a search warrant for contraband and evidence, fruits, and instrumentalities of violations of Title 8, United States Code, Sections 1324a(a)(1)(A), (B) and (f)(1) related to the unlawful employment of aliens, and Title 29, United States Code, Sections 206(a)(1)(C), (f)(1), 215(a)(2) and 216(a) related to violations of the Fair Labor Standards Act.

## **STATUTORY AUTHORITY**

8.      As noted above, this investigation concerns alleged violations of the following:

        a.      Title 8, United States Code, Sections 1324a(a)(1)(A), (B) and (f)(1) prohibit any person from hiring, or recruiting or referring for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien with respect to such

3

employment, or after hiring such an alien, to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.

b.    Title 29, United States Code, Sections 206(a)(1)(C), (f)(1), 215(a)(2) and 216(a) prohibit paying any person, employed in domestic service for more than eight hours in the aggregate in any workweek, less than the federal minimum wage of $7.25 per hour.

## FACTS ESTABLISHING PROBABLE CAUSE

9.    In January 2016, Arundathi Meenakshi RAMPOGAL entered the United States as a B-2, visitor for pleasure, and intended to stay for three months. Based on my training and experience, I know that people who enter on B-2 visas for pleasure are not authorized to be employed or to be compensated in any way for employment. RAMPOGAL was originally sponsored[1] in India by Aruna KARTAN, an old friend of her mother, who passed away. According to RAMPOGAL, Aruna KARTAN told RAMPOGAL that she could stay with her son, Satish KARTAN (herein KARTAN) while in the United States.

10.    After entering the United States on January 8, 2016, RAMPOGAL took a taxi from the Sacramento Airport to KARTAN's residence at 6541 Brook Hollow Circle in Stockton, California (herein TARGET RESIDENCE).

---

[1] A sponsor is someone who writes a letter of financial responsibility to assist a foreign national in obtaining a visa to enter the United States. While a sponsor letter is not always required, it often helps someone get a visa who might not otherwise be eligible.

4

11.     The first day RAMPOGAL arrived at the TARGET RESIDENCE she was told to wash dishes, which she did for fifteen minutes. RAMPOGAL went to bed at 2:30 am and was told to wake up at 5:30 am. After taking a shower, RAMPOGAL was told by KARTAN that she had to feed a child who resided in the home, make juice, and do other household chores.

12.     According to RAMPOGAL, she began working on household chores at the TARGET RESIDENCE. She usually went to bed at 1:30 a.m. and would wake up at 5:30 a.m. KARTAN and his wife, Sharmistha BARAI, would usually wake up between 11:00 a.m. and 1:00 p.m., and go to bed around 2:30 a.m. During the hours they were awake, KARTAN and BARAI would periodically check on RAMPOGAL to ensure she was working.

13.     In the beginning when she first arrived at the TARGET RESIDENCE, RAMPOGAL said she was not permitted to eat because she never had time. When she was making food for the family, RAMPOGAL was not allowed to eat the food she made because that would make KARTAN and BARAI angry. According to RAMPOGAL, KARTAN and BARAI fought often and, in RAMPOGAL's opinion, they would take their anger out on RAMPOGAL.

14.     KARTAN and BARAI rarely left the house, but when they did go out they would take their child with them. They would always leave RAMPOGAL with a list of chores to complete while they were gone. RAMPOGAL would never eat or sleep while the family was gone for fear they would be angry with her. Often times KARTAN and BARAI verbally abused RAMPOGAL when her list of chores were not complete. At one point, RAMPOGAL said that BARAI told RAMPOGAL that she was not working fast enough and if she did not do a better job with the chores, BARAI was going to throw hot water on RAMPOGAL.

5

15.     For the fourteen days she was at the TARGET RESIDENCE, RAMPOGAL said she ate rice once per day and drank coffee that she brought with her or water.  One time RAMPOGAL drank some juice and BARAI got angry with her, and told RAMPOGAL there would not be enough for BARAI to drink.

16.     During her stay at the TARGET RESIDENCE, RAMPOGAL never left the house and called only her husband while she was there.  Since her phone died shortly after her arrival, KARTAN allowed RAMPOGAL to make one phone call a day to her husband in India, and he limited the call to two minutes.  KARTAN would stand next to RAMPOGAL and listen to their conversation.

17.     The last night RAMPOGAL stayed at the TARGET RESIDENCE, she spoke to her husband with KARTAN nearby.  RAMPOGAL spoke to her husband in a different language hoping KARTAN would not understand.  According to RAMPOGAL, RAMPOGAL's husband told her to leave the residence because it was too dangerous for her to stay.  Once the conversation was over, KARTAN told RAMPOGAL that if she left, he would follow her and she would not be able to go anywhere in this country.  KARTAN also told RAMPOGAL that she owed him approximately $2,500 if she wanted to leave.  That night, RAMPOGAL said KARTAN slept by the front door to prevent RAMPOGAL from leaving.

18.     The next morning, RAMPOGAL told KARTAN she was leaving.  He told her she did not have anywhere to go and threatened to have her visa cancelled if she left.

19.     On January 22, 2016, RAMPOGAL left the TARGET RESIDENCE and took a taxi to the Stockton Police Department (SPD), where she filed a police report.

20.     On January 27, 2016, the SPD Vice Unit contacted your affiant, who conducted a public database query and confirmed that KARTAN and BARAI were the individuals living at 6541 Brook Hollow Circle, the TARGET RESIDENCE.  Law enforcement database queries verified that RAMGOPAL had arrived in the United States on January 8, 2016, as she claimed.

21.     According to the SPD report, RAMPOGAL had family in Ohio.  Your affiant contacted RAMGOPAL's sister, Srivalli Dasari, who currently resides in Westerville, Ohio.  Srivalli Dasari stated that RAMGOPAL was currently staying with her in Ohio and was destined to return to India on January 30, 2016.

22.     RAMGOPAL was unwilling to return to California and contact KARTAN and BARAI but agreed to make a consensually monitored phone call to KARTAN.  HSI Columbus SA Greg Dalga provided RAMGOPAL with a recording device and arranged for her to contact KARTAN.  RAMGOPAL used the ruse that she was still in Stockton, California, had run out of money and needed KARTAN's help to return to India.  During their conversation, which was spoken in English, KARTAN made the following statements[2]:

> A.  "I told you it was going to be 6 a.m. to midnight.  Right?  There was nothing new, we didn't do anything that we didn't tell you about."
>
> B.  "...no, no you making you make the same mistake six days in a row.  Huh?  You make the same mistake six days in a row.  Same thing that madam has been...same thing told you for like six times every night she's telling you to do this and you don't do it."

---

[2] The conversation was reviewed by your Affiant and transcribed to the best of your Affiant's abilities.

7

C. "…see, I know how to deport…I, I can report you."

D. "You want me to deport you, say what you want."

During this same conversation, KARTAN denied any wrongdoing but did acknowledge that he sponsored RAMGOPAL's trip to the United States.

23. On January 30, 2016, records checks confirmed that RAMGOPAL departed the United States and returned to India as her sister Srivalli Dasari had previously stated. According to the SPD report, RAMGOPAL was never compensated for her domestic labor while residing with KARTAN and BARAI in the United States.

24. On or about January 30, 2016, your Affiant sent a subpoena request to Sprint Corporation requesting subscriber and phone toll information related to KARTAN's cell phone number, 312-446-6454 (herein referred to as TARGET PHONE).

25. On February 3, 2016, your Affiant received the subpoena results from Sprint. According to its records, the subscriber to the TARGET PHONE was FIS Global – Master Account, P.O. Box 2610, Jacksonville, FL. A review of the phone toll information revealed that the most frequent number contacted by the TARGET PHONE was 630-338-7163. A public database query of that number indicated 630-338-7163 belongs to Sharmistha BARAI.

26. Another number located on the phone toll analysis was 224-678-5472, which, according to public database queries, was associated with an advertisement for an Indian nanny in Albuquerque, New Mexico. The phone number 224-678-5472 had appeared on a website called Pragathi.com. A review of this website revealed that between April 2014 and May 2015, Pragathi.com listed approximately 19 different advertisements for Indian nannies, each offering to pay between $1,800 and $2,000 per month, and all listed the contact number as 224-678-5472.

8

27.     Further investigation of Pragathi.com revealed that between June 2015 and February 2016, there were nine advertisements for live-in nannies in Stockton, California, all offering to pay $2,000 a month. All of these advertisements listed the same contact number of 224-678-5472.

28.     Additional public database queries revealed that KARTAN and BARAI both advertised for live-in nannies using their names, phone numbers and email addresses. These email addresses included sharmistha.barai@gmail.com and sqlforlife@yahoo.com. An advertisement dated May 25, 2014 stated the following:

> "We are looking for a live in nanny who can help us with our one year old baby, cooking and household work. We live in Albuquerque, New Mexico. We are very happy to provide a ticket for the flight. We provide a separate room in addition to a good salary. If you are interested, for details please contact me at sharmistha.barai@gmail.com or call me (Sharmistha) at 630-3387163 my husband (Satish) at 312-446-6454. Even if you are unavailable, if you can refer us to somebody who can join our family as a Nanny, we will appreciate the help. Thank you very much!"

29.     A search of law enforcement databases revealed that in May of 2014, KARTAN and BARAI were residing in Albuquerque, New Mexico. The search also showed that they moved to Stockton, CA in approximately May or June of 2015.

9

30.     On February 16 and 17, 2016, a source of information[3] (SOI) placed a phone call to the most recent advertisement on Pragathi.com requesting a nanny in Stockton, CA. The SOI called 224-678-5472 and left two messages. When the SOI did not receive a call back, s/he sent a message through Pragathi.com regarding the advertisement.

31.     On February 17, 2016, at 7:16 pm, KARTAN used his email account sqlforlife@yahoo.com to respond to the SOI. In the email message, KARTAN stated that the family was traveling to India for a few weeks for an emergency but would contact the SOI upon his return.

## TECHNICAL INFORMATION REGARDING YAHOO and GOOGLE

32.     Based on my training and experience, and publicly available information, I have learned that Yahoo! Inc. and Google, Inc. provide a variety of on-line services, including email access, to the general public. Yahoo! Inc. and Google, Inc. allow subscribers to obtain email accounts at the domain name yahoo.com and gmail.com, like the email accounts listed in Attachment A-1. Subscribers obtain a Yahoo! Inc. or Google, Inc. email account by registering with Yahoo! Inc. or Google, Inc. During the registration process, Yahoo!, Inc. and Google, Inc. ask subscribers to provide basic personal information. Therefore, the computers of Yahoo! Inc. and Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo! Inc. and Google, Inc. subscribers) and information concerning subscribers and their use of Yahoo! Inc. or Google, Inc. services, such as account access information, e-mail transaction information, and account application information.

---

[3] The source of information in this case was a Indian national who speaks fluent English and Hindi. The SOI left several messages in English and used an English name when responding to the email.

10

33.     In general, an email that is sent to a Yahoo! Inc. or Google, Inc. subscriber is stored in the subscriber's "mail box" on Yahoo! Inc. and Google, Inc. servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Yahoo! Inc.'s and Google, Inc.'s servers indefinitely.  The user can move and store messages in personal folders such as a "sent folder."  In recent years, Yahoo! Inc. and Google, Inc., and other ISPs have provided their users with larger storage capabilities associated with the user's email account.  Yahoo! Inc., Google, Inc., and other ISPs have allowed users to store up to one (1) terabyte of information associated with the account on ISP servers.  Based on conversations with other law enforcement officers with experience in executing and reviewing search warrants of email accounts, I have learned that search warrants for -mail accounts and computer systems have revealed stored emails sent and/or received many years prior to the date of the search.

34.     When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Yahoo! Inc.'s and Google, Inc.'s servers, and then transmitted to its end destination.  Yahoo! Inc. and Google, Inc. typically save a copy of the sent email.  Unless the sender of the email specifically deletes the email from the Yahoo! Inc. or Google, Inc. server, the email can remain on the system indefinitely.

35.     A sent or received email typically includes the content of the message (including attachments), source and destination addresses, the date and time at which the email was sent, and the size and length of the email.  If an email user writes a draft message but does not send it, that message may also be saved by Yahoo! Inc. but may not include all of these categories of data.

36.     A Yahoo! Inc. or Google, Inc. subscriber can also store files, including emails,

11

address books, contact or buddy lists, calendar data, pictures, and other files, on servers

maintained and/or owned by Yahoo! Inc. and Google, Inc.  In my training and experience,

evidence of who was using an email account may be found in address books, contact or buddy

lists, email in the account, and attachments to emails, including pictures and files.

37.     Many subscribers to Yahoo! Inc. and Google, Inc. do not store copies of the

emails stored in their Yahoo! Inc. or Google, Inc. account on their home computers.  This is

particularly true because they access their Yahoo! Inc. and Google, Inc. accounts through the

Internet, and thus it is not necessary to copy emails to a home computer to use the service.

Moreover, an individual may not wish to maintain particular emails or files in their residence to

ensure others with access to the computer cannot access the emails.

38.     In my training and experience, generally email providers like Yahoo! Inc. and

Google, Inc. ask each of their subscribers to provide certain personal identifying information

when registering for an email account.  This information can include the subscriber's full name,

physical address, telephone numbers (usually a mobile number) and other identifiers, alternative

email addresses, and, for paying subscribers, means and source of payment (including any credit

card or bank account number).  In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.  Based on my training and my experience, I know that even if

subscribers insert false information to conceal their identity, I know that this information often

provide clues to their identity, location or illicit activities.

39.     The mobile number and alternate email information provided to Yahoo! Inc. and

Google, Inc., by the user are particularly useful in instances where a user needs to recover his/her

12

account in the event of a lost password or account compromise. With these, Yahoo! Inc. and Google, Inc. can send a "reset password" link to the alternate email address, or an SMS message to the mobile number. Upon receiving the "reset password" link to an SMS mobile number affiliated with that account, the user can then reset the password in order to continue to utilize that particular account. Because both a mobile device number and alternate email address are used to recover access to an account, they both tend to be closely associated with the user of the account. It is important to note that although Yahoo! Inc. and Google, Inc. attempt to validate the personal identifying information provided by subscribers, the validation requires additional voluntary input from users. As this additional input is voluntary, Yahoo! Inc. and Google, Inc. are not always successful in validating a user's personal identifying information.

40. When creating an account at Yahoo! Inc. and Google, Inc., the user is provided the opportunity to create a display name and an associated "profile." Yahoo! Inc. and Google, Inc. allow a user to personalize his or her profile by adding an image that represents the user. The display name and display image a user provides for a profile is public and can be seen by anyone, even if the user chooses to keep the rest of the profile hidden from other users.

41. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Yahoo! Inc.'s and Google, Inc.'s websites), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the IP

13

address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access an email account.

42. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

43. In my training and experience, email users often use email accounts for everyday transactions because it is fast, low-cost, and simple to use. People use email to communicate with friends and family, manage accounts, pay bills, and conduct other online business. Email users often keep records of these transactions in their email accounts, to include personal identifying information such as name and address.

44. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

45. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct

14

under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored in the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Lastly, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

15

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

46.     I anticipate executing these warrants under the Electronic Communications

Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the

warrant to require Google Inc., to disclose to the government copies of the records and other

information (including the content of communications) particularly described in Attachment A-1,

and Section I of Attachment B.  Upon receipt of the information described in Section I of

Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B.

47.     This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A)

& (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has

jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(I).

## REQUEST TO SEAL & ORDER NON-DISCLOSURE

48.     Because the investigation is ongoing, I would request the Court to seal the

Application for Search Warrant, the Search Warrant, and supporting Affidavit in this matter.

49.     Pursuant to 18 U.S.C. § 2705(b), I would request the Court order Google, Inc. not

to notify any other person of the existence of this warrant for one year.  This request is made

because I believe notification of the existence of the warrant will seriously jeopardize the

ongoing investigation.

50.     The basis for this request is that this investigation is ongoing and involves

individuals who are not currently in custody.  HSI is continuing this investigation and notice of

these search warrants could change their location and operations, and could lead to intimidation

16

of known and unknown witnesses, destruction or tampering with evidence, and otherwise seriously jeopardize the investigation.  See 18 U.S.C. § 2705(b).  Due to the complexity and international nature of the ongoing investigation, I request that the Court order notice delayed by one year.

## **CONCLUSION**

51.    Based on the foregoing, I believe there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, will be found in the TARGET ACCOUNT, as described in Attachment A-1.  I respectfully request that this Court issue a search warrant for the TARGET ACCOUNT, authorizing the seizure and search of the items described in Attachment B.

///

///

///

///

///

///

///

///

///

///

///

17

52.     Because the warrant will be served on Google Inc., which will then compile the

requested records at a time convenient to them, there exists reasonable cause to permit the

execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. §

2703(g), the presence of a law enforcement officer is not required for the service or execution of

this warrant.

Marc Beeson
Special Agent
Homeland Security Investigations


Approved as to form by

JOSH FRANKLIN SIGAL
Special Assistant United States Attorney

Sworn and subscribed before me this ____ day of _____, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF CALIFORNIA

## ATTACHMENT A-1

## DESCRIPTION OF GOOGLE ACCOUNTS TO BE SEARCHED

The accounts to be searched are the following:

All Google accounts associated with the following email addresses:

-   sharmistha.barai@google.com

**All contents regardless of time period.**

## ATTACHMENT B

## ITEMS TO BE SEIZED

### I.     Information to be disclosed by Google Inc.

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Google, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Google, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google, Inc. is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

a.           To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, including any emails, text messages, voice messages, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

a.     The contents of all emails, text messages, and or voice messages associated with the account, including stored or preserved copies of emails, text messages, and or voice messages sent to and from the account, draft emails, text messages, and or voice messages, the source and destination addresses or numbers associated with each email, text message, and or voice message, the date and time at which each email, text message, and or voice message was sent, and the size and length of each;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP

B-1

address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses or telephone numbers provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    The types of service utilized;

    d.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

    e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I and associated with the email address listed in Attachment A-1 that constitutes fruits, evidence and instrumentalities of the crimes of hiring, or recruiting or referring for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien with respect to such employment, or after hiring such an alien, to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment or the crime of paying any person, employed in domestic service for more than eight hours in the aggregate in any workweek, less than the federal minimum wage of \$7.25 per hour.

## IV.    Method of delivery

Items seized pursuant to this search warrant can be served by sending, on any digital media device, to the Special Agent designated on the fax cover sheet located at the address 603 San Juan Avenue 2nd Floor, Stockton, California, 95203.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| ) | Case No. |
| **Google, Inc. accounts** ) | |
| ) | |
| ) | **2 1 6 - SW - 0 1 2 4    EFB** |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 15, 2016 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    3-2-2016
                         at 2.35 pm.

                                                    _____
                                                    *Judge's signature*

City and state:    Sacramento, California          Edmund F. Brennan, U.S. Magistrate Judge
                                                    *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                             Date

## ATTACHMENT A-1

### DESCRIPTION OF GOOGLE ACCOUNTS TO BE SEARCHED

The accounts to be searched are the following:

All Google accounts associated with the following email addresses:

-   sharmistha.barai@google.com

**All contents regardless of time period.**

A-1

# ATTACHMENT B

## ITEMS TO BE SEIZED

**I.** **Information to be disclosed by Google Inc.**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Google, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Google, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google, Inc. is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

a.        To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, including any emails, text messages, voice messages, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

a.        The contents of all emails, text messages, and or voice messages associated with the account, including stored or preserved copies of emails, text messages, and or voice messages sent to and from the account, draft emails, text messages, and or voice messages, the source and destination addresses or numbers associated with each email, text message, and or voice message, the date and time at which each email, text message, and or voice message was sent, and the size and length of each;

b.        All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP

B-1

address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses or telephone numbers provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.     The types of service utilized;

    d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

    e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I and associated with the email address listed in Attachment A-1 that constitutes fruits, evidence and instrumentalities of the crimes of hiring, or recruiting or referring for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien with respect to such employment, or after hiring such an alien, to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment or the crime of paying any person, employed in domestic service for more than eight hours in the aggregate in any workweek, less than the federal minimum wage of $7.25 per hour.

## IV.    Method of delivery

Items seized pursuant to this search warrant can be served by sending, on any digital media device, to the Special Agent designated on the fax cover sheet located at the address 603 San Juan Avenue 2nd Floor, Stockton, California, 95203.